**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Matthew Thomas, | No. CV-21-01900-PHX-MTL |
| Plaintiff, | **ORDER** |
| v. | |
| BNSF Railway Company, | |
| Defendant. | |

Plaintiff Matthew Thomas is a former BNSF Railway Company ("BNSF") engineer. He alleges BNSF retaliated against him because of his whistleblower status under the Federal Railway Safety Act ("FRSA"). Specifically, Thomas claims that when he engaged in protected activities such as reporting concerns regarding BNSF's hours of service violations to the Federal Railroad Administration ("FRA") and when he voiced safety and mistreatment concerns to his supervisors, BNSF retaliated against him by terminating him. BNSF, however, asserts that it was Thomas' handling of a train—which derailed under his control and caused $2.2 million in damages—that led to his termination. Currently pending before the Court are BNSF's motion to exclude two of Thomas' purported experts (Doc. 50) and motion for summary judgment on the FRSA claim (Doc. 49).* For the reasons listed below, the Court will grant both motions.

---

* At Oral Argument, Plaintiff conceded he no longer intends to use Tom Pate or Dan Markley as experts, and that he abandons his second claim, Violation of the Americans with Disabilities. (Doc. 60.) The Court then excluded Tom Pate and Dan Markley as experts, and entered judgment in favor of BNSF with respect to the Americans with Disabilities Act claim. (Doc. 61.)

I.     **MOTION TO EXCLUDE**

BNSF moves to exclude two of Plaintiff's purported experts: (1) Robert Newman and (2) Robert McCarthy on timeliness and *Daubert* grounds.

A.     **Standard of Review**

1.     **Rules 26 and 37**

Federal Rule of Civil Procedure 26(a)(2) requires parties to disclose the identity of each expert witness, "accompanied by a written report prepared and signed by the witness," by a date set by the Court. Fed. R. Civ. P. 26(a)(2)(A)-(C). Rule 37(c)(1) "gives teeth to these requirements" by forbidding the use of any improperly disclosed information in a motion, at a hearing, or at trial. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001); *see also* Fed. R. Civ. P. 37(c)(1) ("[i]f a party fails to provide information or identify a witness as required under Rule 26(a) . . . the party is not allowed to use that information"). Courts have excluded expert testimony under Rule 37(c)(1) "even when a litigant's entire cause of action or defense has been precluded." *Yeti by Molly, Ltd.*, 259 F.3d at 1106.

Two exceptions "ameliorate the harshness of Rule 37(c)(1)." *Id.* The material may be used if the party's failure to properly disclose was "substantially justified" or "harmless." Fed. R. Civ. P. 37(c)(1). The party making the late disclosure—here, Thomas—bears the burden of establishing that the failure to disclose was substantially justified or harmless. *See Torres v. City of Los Angeles*, 548 F.3d 1197, 1213 (9th Cir. 2008) ("[T]he burden is on the party facing the sanction . . . to demonstrate that the failure to comply with Rule 26(a) is substantially justified or harmless."). Rule 37(c) is intended to be a "self-executing, automatic sanction to provide [ ] a strong inducement for disclosure of material." *Yeti by Molly, Ltd.*, 259 F.3d at 1106 (citing Fed. R. Civ. P. 37 Advisory Committee's Note (1993)) (quotations omitted).

2.     ***Daubert***

A party seeking to offer expert testimony must establish that the testimony satisfies

Rule 702 of the Federal Rules of Evidence. That rule provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

As gatekeepers, trial judges make a preliminary assessment as to whether expert testimony is admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). The "trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. To meet the requirements of Rule 702, an expert must be qualified, the expert's opinion must be reliable in that it is based on sufficient facts or data and is the product of reliable principles and methods, and the expert's testimony must fit the case such that the expert's opinion is relevant. *Id.* 588–95. Because the requirements of Rule 702 are conditions for determining whether expert testimony is admissible, a party offering expert testimony must show by a preponderance of the evidence that the expert's testimony satisfies Rule 702. *See* Fed. R. Evid. 104(a); *see also Lust v. Merrell Dow Pharms. Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

**B. Discussion**

**1. Mr. McCarthy**

The Court's Scheduling Order requires the parties to provide "full and complete expert disclosures, as required by Rule 26(a)(2)(A)-(C) of the Federal Rules of Civil Procedure," no later than September 16, 2022 for Thomas, October 17, 2022 for BNSF, and November 17, 2022 for rebuttal expert disclosures. (Doc. 26 at 2–3.) The discovery deadline, including expert depositions, was originally scheduled for December 16, 2022,

and was continued for an additional 30 days until January 15, 2023. (*Id.*; Doc. 50-1 ¶ 3.)

On November 18, 2022, months after his expert disclosure deadline, Thomas submitted an amended expert disclosure statement disclosing Mr. Newman and Mr. McCarthy as retained expert witnesses (the "November 18 Disclosure"). (Doc. 50-5.) Thomas explains that he did not seek an extension from the Court because he did not wish to burden it, and instead reached an agreement with BNSF to submit his expert disclosures by November 18, 2022. (Doc. 60; Doc. 51 at 5.) The November 18 Disclosure, however, only included Mr. Newman's report. (Doc. 50-5.) It was not until December 9, 2022, when Thomas submitted another amended expert disclosure report and provided Mr. McCarthy's report for the first time. (Doc. 50-6 at 6–10.)

Thomas—who bears the burden to prove that his failure to timely disclose Mr. McCarthy was substantially justified or harmless—makes no attempt to argue either exception in his response. (Doc. 51.) He only briefly argues that his initial disclosure of Mr. McCarthy was identical to BNSF's disclosure of one of its witnesses, but does not explain how that satisfies his burden to demonstrate Mr. McCarthy's late disclosure was either harmless or substantially justified. (*Id.* at 5–6.) It was only at Oral Argument, where counsel for Thomas explained that Mr. McCarthy's report "was inadequate and his scheduling got away from us . . . so I had to go back to him several times and delayed in getting that report in." (Doc. 60 at 30:23-31:3.) Counsel also explained that Mr. McCarthy was "embarrassingly MIA." (Doc. 60 at 31:4-31:5.) Those explanations, however, fall short of establishing Thomas' burden to prove Mr. McCarthy's late disclosure was either substantially justified or harmless. *See Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011) (finding plaintiff did not meet her burden that her untimely expert disclosures were either substantially justified or harmless when her attorney explained that he "simply failed to read the court's scheduling order" and disclosed the expert reports months after the deadline).

The Court excludes Mr. McCarthy's report as untimely, and Thomas fails to meet his burden that the late disclosure was either harmless or substantially justified.

**2.     Mr. Newman**

With respect to Mr. Newman's late disclosure, Thomas only asserts that his late disclosure was harmless. (Doc. 51 at 3–4.) Thomas argues that Mr. Newman's late disclosure was harmless because his deposition took place on December 15, 2022, and BNSF had "over a month to review the transcript of expert Newman's deposition," and had "adequate time to strategize and prepare for both [s]ummary [j]udgement and [t]rial." (*Id.*) The Court agrees that Mr. Newman's late disclosure was harmless because Thomas disclosed his report by the agreed upon November 18, 2022, deadline, and that BNSF could depose Mr. Newman after reviewing his report. (*Id.*)

BNSF argues should this Court find "that [Mr.] Newman's testimony is not time-barred by Thomas' late disclosure, it should exclude Mr. Newman's testimony, evidence, documents and opinions pursuant to Federal Rule of Evidence 702." (Doc. 50 at 6.)

Thomas engaged Mr. Newman to testify and opine on the train derailment that occurred on July 25, 2020, during Thomas' employment, and as BNSF argues, under Thomas' control. (Doc. 50; Doc. 50-5 at 2.) BNSF moves to exclude Mr. Newman because, in its view, he merely speculates what caused the derailment and uses unreliable methods. Thomas, heavily relying on Arizona and New Hampshire law, argues that Mr. Newman's report can be "shaky" yet permissible and that the jury should "exercise its fact-finding function." (Doc. 51 at 7–9.) The Court agrees with BNSF.

Mr. Newman's expert report opinion and testimony consist of possible rail defects that could have existed, and how such a hypothetical rail defect could lead to a derailment. (Doc. 50-5 at 14, 17, 19–20.) Mr. Newman was unable to testify with any certainty or particularity that a rail defect existed on the July 25, 2020 train derailment or that any such hypothetical defect caused that derailment. Specifically, Mr. Newman testified:

> Q. But you don't have any specific evidence that a sun kink occurred on July 25th, 2020, or thereabouts, to cause this derailment?
> A. Well, one of the pictures shows something off in the distance. **It could have been a sun kink.** And it's in my report.
>  Q. So let's look at your report. And I'm going to share my

- 5 -

> screen. Okay. I'm on Page 2. It starts with "Introduction." If you could point to me where you're referring to this picture.
> A. All I see is text right now. I don't see any pictures.
> Q. Okay. Down at the bottom, you say, ["]the next page shows some examples of sun kinks["].
> A. Right.
> Q. And then you go to the next page.
> **A. Okay. The first picture shows what a sun kink looks like. That's not the track at the derailment scene.**
> **Q. Okay.**
> A. The next picture looks like a sun kink, and it's off in the distance of one of those ones we looked at a little while ago.
> Q. All right. Do you know if – this picture that you have right here in your report, **you said it's an example of a sun kink. Is this from the actual derailment with BNSF involved in this case or is this another example generally of a sun kink?**
> **A. No, this is – in one of the pictures that we looked at, off in the distance is something that looks like a sun kink.**

(Doc. 50-7 at 36:17–37:25 (emphasis added).) The above testimony clearly demonstrates that Mr. Newman never examined the actual site or the track of the derailment at issue, and only looked at a few pictures taken from a distance by someone else. (Doc. 50-5 at 14-15.)

Mr. Newman's report and testimony also make clear that, not only did he fail to rely on substantial facts or data, he failed to rely on fundamental facts or data—such as the location of the derailment or the temperature of the location. For example:

> Q. So you're measuring the temperature in Phoenix, right?
> A. Um, I looked at the and I can't remember if I used Phoenix or not. Is that what's in the report?
> Q. That's what's in the report.
> A. Okay, well, that's what I used, then.
> **Q. Okay. And do you know where this derailment actually occurred in Arizona?**
> **A. I don't know exactly. I did, but I can't tell you right now.**
> Q. Okay. But you didn't look up the – or include in your report the temperature at the area itself where the derailment occurred?
> A. It was nearby. That's about all I can say.
> Q. Do you believe this was near Phoenix?

```
                A. It was – yes.
                Q. Okay.
                A. If that's what's in the report –
                Q. Let's go to your report. So you indicated the high
                temperature in Phoenix was 99 degrees Fahrenheit on
                Friday, July 24th, 2020 and 104 degrees Fahrenheit on July
                25th, 2020 according to the World Weather website. So
                you're using the temperature in Phoenix, correct?
                A. Yes.
                Q. Do you know what BNSF rail specifies for its rail neutral
                temperature in the area where the derailment occurred?
                A. No, I don't.
                Q. Did you do any testing to check the rail neutral temperature
                near the derailment site?
                A. No.
                Q. Do you have any evidence that the rail neutral temperature
                was not per BNSF specifications?
                A. No, I don't know if it met or was higher or lower than what's
                specified.
                Q. Do you know if the rail was in tension or compression when
                the derailment occurred?
                A. No.
```

(Doc. 50-7 at 47:4–48:21) (emphasis added).

"To carry out its gatekeeping role, a district court must find that an expert's testimony is reliable—an inquiry that focuses not on 'what the experts say,' or their qualifications, 'but what basis they have for saying it.'" *United States v. Holguin*, 51 F.4th 841, 854 (9th Cir. 2022) (quoting *Daubert*, 43 F.3d at 1316.) For such a showing to be sufficient, Mr. Newman must explain precisely how he went about reaching his conclusions and point to some objective source, and he must describe his research "in sufficient detail that the district court [can] determine if the research was scientifically valid." *United States v. Rincon*, 28 F.3d 921, 924 (9th Cir. 1994).

Thomas has made no such showing with respect to Mr. Newman. As noted above, Mr. Newman relied on the temperature in Phoenix, Arizona, when the derailment occurred in the mountains, near Prescott, Arizona. (Doc. 60 at 9:6-10:14.) Weather conditions in Phoenix differ substantially when compared to conditions in Prescott. Mr. Newman also

did not visit the location, examine the site, or rely on adequate depictions of the rail at issue. Where the derailment occurred and the temperature of the location are necessary facts to generate a sound opinion on what could have caused a derailment, particularly when the basis of the opinion is that something like a sunkink, which was out of Thomas' control, caused the derailment. (Doc. 50-5 at 14–15.) Here, the Court has only been presented with Mr. Newman's qualifications and elusive hypotheticals, and "[u]nder *Daubert*, that's not enough." *Daubert*, 43 F.3d at 1319; *see also McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 807 (9th Cir. 1988) (finding that a district did not abuse its discretion when excluding expert testimony that had a "scant basis in the record.").

Because Mr. McCarthy's disclosure was untimely and Mr. Newman's opinion and testimony are not based on sufficient facts or data, the Court grants BNSF's Motion to Exclude both experts.

## II.     MOTION FOR SUMMARY JUDGMENT

### A.     Factual Background

Thomas began his employment with BNSF in April 2013. (Doc. 19 ¶ 11.) In 2014 and 2015, Thomas took two separate medical leaves. (Doc. 49-1 at 142–45, 410–11.) Thomas returned to work in July 2015 and began to accrue attendance violations. (*Id.* at 410–14.) BNSF provided Thomas with an opportunity for a hearing on each attendance issue, but his performance did not improve, and he was eventually terminated in February 2016. (Doc. 49-9 ¶ 6.) Thomas appealed his dismissal to the Public Law Board, and on December 13, 2018, it altered Thomas' dismissal to a Level-S suspension with a 36-month review period. (*Id.*) BNSF then began Thomas' return-to-work process, which included rules testing, training, and a fitness-for-duty review. (Doc. 49-6 at 4 ¶ 11.) Thomas returned to BNSF on January 26, 2019, as an engineer and conductor. (*Id.* ¶ 12.)

Months after his return, Thomas accumulated numerous violations. (Doc. 49-1 at 410–11.) On August 2, 2019, Thomas was unavailable and did not timely respond to BNSF while he was on-call. (*Id.*; Doc. 49-6 at 5 ¶ 13, 327.) Complying with the collective bargaining agreement process for discipline, BNSF provided Thomas a notice of

investigatory hearing for September 4, 2019, which was presided over by James Orr, Superintendent of Operations for Gallup Subdivision. (Doc. 49-6 at 5 ¶ 14, 338–40.) Mr. Orr heard testimony and evidence from both BNSF management and Thomas. (Doc. 49-6 at 5 ¶ 14, 342–64.) BNSF ultimately issued a "Standard 20 Day Record Suspension for [Thomas'] failure to be available for call job N-PHXWIN2-02-A on duty 1301 hours, August 2, 2019." (Doc. 49-7 at 3.)

Shortly thereafter, on August 6, 2019, Thomas and his crew members failed to "properly perform the Class I Air Brake Test, and Thomas was dishonest when answering his supervisor's question about his use of an air gauge as part of this test." (Doc. 49-10 at 3–4 ¶ 4.) Because Thomas was still "within the review period of the Level S discipline related to his reinstatement, BNSF could have dismissed him" under its Policy for Employee Performance Accountability ("PEPA Policy"), but instead "exercised leniency" and issued a "Level S discipline with an actual suspension." (*Id.*)

Later, on April 13, 2020, Thomas was assigned an on-call shift, but again failed to timely answer to receive his assignment. (Doc. 49-1 at 410–14; Doc. 49-6 at 6 ¶ 24.) Mr. Orr again presided over Thomas' investigatory hearing regarding this violation. (Doc. 49-6 at 6 ¶ 24; Doc. 49-7; Doc. 49-7 at 161.) The evidence presented to Mr. Orr confirmed that Thomas had not timely answered BNSF's call as required. (Doc. 49-6 at 6–7 ¶ 25, Doc. 49-7 at 169–79.) At the conclusion of the investigatory hearing, Mr. Orr found that "[a]lthough Thomas stood for dismissal under the PEPA Policy due to his prior dishonesty and multiple occasions of Serious-level discipline," he "recommended leniency and merely issued Thomas a ten-day record suspension rather than terminating him." (Doc. 49-6 at 7 ¶ 26; Doc. 49-10 at 8.)

On July 13, 2020, Thomas partook in another violation "for failing to be ready to work and refusal to perform service." (Doc. 49 at 7; Doc. 49-1 at 410–11; Doc. 49-3 at 17:7-16.) Jason Wade, who was the Terminal Trainmaster at the time, gave instructions to the foreman of Thomas' crew to begin start preparing a locomotive for departure. (*Id.* at 21:18-25, 22:8-11, 23:7-11.) After about an hour on duty, Mr. Wade learned that the crew

was still in the breakroom and had yet to begin their work. (*Id.* at 22:1-14; Doc. 49-6 at 7 ¶ 27.) Mr. Wade spoke with the foreman again and instructed that the crew begin their work. (Doc. 49-3 at 22:1-14.) Shortly thereafter, when the crew still had not begun working, Mr. Wade approached the crew in the breakroom. (*Id.* at 26.) Thomas explained that he would not work until "he got a ticket." (*Id.* at 36:24-25.) The "ticket" that Thomas sought was to account for his rest, when he can go off duty, and how BNSF determines his pay. (*Id.* at 38:15-18.)

Despite there being no rule or collective bargaining agreement provision requiring employees to have the type of ticket that Thomas demanded, he refused to perform his duties without one because he believed doing so would violate FRA regulations. (Doc. 49-3 at 25:7-11, 33:19-23, 34:10-15; Doc. 57-1 at 426.) Because he refused to work without a ticket, Mr. Wade sent Thomas home and assigned someone else to cover his duties. (Doc. 49-3 at 17:7-16; Doc. 49-2 at 31:1-9.) After the incident Thomas submitted a report to the FRA Inspector stating, "I was ordered to perform service in what I believe is a violation of CFR 228.11 by trainmaster Jason Wade." (Doc. 57-1 at 426.)

Less than two weeks later, on July 25, 2020, a train Thomas was operating derailed, resulting in over $2.2 million in damage. (Doc. 49-9 at 5 ¶ 10; Doc. 49-8 at 140–46; Doc. 49-1 at 414–17.) BNSF sent different teams to inspect the derailment scene, and then sent the collected data to its Technical Research and Development group to determine the cause of the derailment. (Doc. 49-5 at 32:8-24; 38:5-39:21.) The Technical Research and Development group analyzed the data, ran a reenactment, and determined train handling—specifically, excessive dynamic braking by Thomas—to have caused the derailment. (Doc. 49-5 at 33:3-19; Doc. 49-8 at 140-46.)

BNSF conducted an investigative hearing for Thomas and his co-crewmember on September 3, 2020. (Doc. 49-8 at 108, 112.) Mr. Orr again presided over the investigative hearing, and both Thomas and his co-crewmember attended the investigatory hearing with union representatives. (Doc. 49-6 at 8–9 ¶ 32.) BNSF presented evidence from its Technical Research and Development group and that their data confirmed excessive

dynamic braking to be the cause of the derailment. (Doc. 49-8 at 151–236.) Thomas, as the engineer for the July 25, 2020 train, was determined by this analysis to be solely responsible for dynamic braking. (*Id.* at 173–75; Doc. 49-5 at 44:19-24, 47: 5-13, 55:7-19.) At the investigatory hearing, Thomas argued that the train contained an insufficient number of dynamic brakes and that there were empty cars inappropriately placed. (Doc. 49-8 at 148.) In response, Benjamin Strot, Superintendent of Safety & Operating Practices, provided testimony that the train was safe and complied with all regulatory requirements. (*Id.* at 49-8 at 128–29, 198–200.) After reviewing the materials presented and listening to testimony, Mr. Orr recommended "Level S discipline" to Thomas for improper train handling. (Doc. 49-2 at 44:20-45:6; Doc. 49-10 at 5 ¶ 7.) Thomas' co-crewmember, who was not responsible for braking or the derailment, was not subject to discipline. (Doc. 49-10 at 5 ¶ 7.) The PEPA Labor Relations team performed an independent, neutral review of the investigatory record. (*Id.* at ¶10.) Thomas' improper handling of the train, which led to its derailment, constituted his fourth Level S violation within a single review period and subjected him to dismissal under BNSF's PEPA Policy. (*Id.*) BNSF ultimately terminated Thomas on September 29, 2020, "for carelessness of the safety of [him]self and others when [he] failed to properly control [his] train consistent with good train handling and limit[ing] excessive in-train forces resulting in damage to track structure and equipment . . . on July 25, 2020." (Doc. 49-10 at 10.)

    **B.**    **Standard of Review**

A movant is entitled to summary judgment if it demonstrates "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is "genuine" where the evidence is such that a reasonable jury could find in favor of the non-moving party. *Id.* The moving party bears the "burden of establishing the nonexistence of a 'genuine issue.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "This burden has two distinct components: an initial burden of production, which shifts to

the non[-]moving party if satisfied by the moving party; and an ultimate burden of persuasion, which always remains on the moving party." *Id.*

In deciding, the court may only consider admissible evidence. *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002). As such, the nonmoving party may not defeat a properly supported motion with mere allegations or denials in the pleadings. *Liberty Lobby*, 477 U.S. at 248. At this stage, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor." *Id.* at 255. The "mere existence of a scintilla of evidence," however, will not defeat summary judgment. *Id.* at 252.

Rule 56(c) requires the parties to support assertions by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c). The court is not obligated "to scour the record in search of a genuine issue of triable fact[;]" rather, the nonmoving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (brackets in original) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). Summary judgment will thus be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

**C.      Discussion**

To establish a claim of unlawful discrimination under the FRSA, the plaintiff must prove by a preponderance of the evidence that the protected conduct "was a contributing factor in the unfavorable personnel action alleged in the complaint." *Rookaird v. BNSF Railway Co.*, 908 F.3d 451, 454 (9th Cir. 2018) (citing 49 U.S.C. § 42121(b)(2)(B)(iii)). A contributing factor is "any factor, which alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Id.* at 461 (internal quotation marks omitted). If the plaintiff succeeds, the employer can attempt to rebut the allegations and

defeat the claim by demonstrating "by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the protected activity]." *Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1195 (9th Cir. 2019) (citing 49 U.S.C. § 42121(b)(2)(B)(iv)). "Importantly, the only burden the statute places on FRSA plaintiffs is to ultimately prove, by a preponderance of the evidence, that their protected conduct was a contributing factor to the adverse employment action—i.e., that it 'tend[ed] to affect' the decision in some way." *Id.* (citing 49 U.S.C. § 42121(b)(2)(B); *Rookaird*, 908 F.3d at 461).

Under the FRSA, "protected activity includes an 'employee's lawful, good faith . . . refus[al] to violate or assist in the violation of any Federal law, rule, or regulation relating to railroad safety or security.'" *Rookaird*, 908 F.3d at 456 (quoting 49 U.S.C. § 20109(a), (a)(2)). By its terms, the FRSA requires that an employee refuse to "violate a rule or regulation, necessarily requiring some action by the employer (e.g., an order to perform or not perform, or to start or stop, a particular action) which prompts the employee's 'refusal.'" *Id.* "Thus, an employee who simply performs basic job duties has not 'refused' to violate any rule or regulation unless those job duties are covered by a rule or regulation." *Id.* (citing *Sievers v. Alaska Airlines, Inc.*, ARB No. 05-109, 2008 WL 316012, at *3–4 (Jan. 30, 2008)).

Thomas relies on three incidents to support his FRSA retaliation claim. First, he alleges that "he engaged in protected activity on July 13, 2020, when [he] reported to the FRA concerns about BNSF's violations of FRA rules regarding his hours of service." (Doc. 19 ¶ 49.) Second, he alleges he "engaged in protected activity on July 25, 2020, when he and his co-conductor spoke up about the safety issues with the key train." (*Id.* ¶ 50.) Third, Thomas alleges that "he engaged in protected activity on July 26, 2020, when he and his co[-]workers spoke up about the mistreatment they were experiencing from BNSF." (*Id.* ¶ 51.) The Court addresses each of Thomas' purported protected activities below and whether any contributed to Thomas' termination.

### 1. July 13, 2020

After Thomas was sent home for refusing to work his shift on July 13, 2020, he submitted a report to the FRA Inspector that same day. (Doc. 57-1 at 426.) In his report, he explained that he repeatedly asked his supervisors for a train ticket and "was ordered to perform service in what [he] believe[s] is a violation of CFR 228.11 by trainmaster Jason Wade." (*Id.*)

Thomas argues that "his refusal to perform work" was premised "on the good faith belief that performing without a ticket would be a violation of FRA regulations." (Doc. 57 at 15.) Thomas, however, fails to identify a single law, rule, or regulation where he was required to work with a ticket, and that his refusal to work without one, violated such law, rule, or regulation. (Doc. 57.) Thomas similarly fails to cite any authority at all to support his "good faith" argument. (*Id.*) Thomas also fails to argue or provide any evidence that demonstrates a causal connection between his July 13, 2020 letter to the FRA and his termination. (*Id.*) Rather, he states in a conclusory fashion, that these events were "a contributing factor in receiving the S Level discipline" that resulted in his dismissal. (Doc. 57 at 18.) And in support of his conclusory contention, Thomas cites to his July 13, 2020 letter addressed to the FRA, but provides no evidence that it was sent to or received by anyone at BNSF. This is important because Thomas must prove, by a preponderance of the evidence, that BNSF fired him *because* of his July 13, 2020 letter to the FRA. Thomas also cites to correspondence from 2019 regarding his post-arbitration reinstatement, which pre-dates and is unrelated to the July 13, 2020 letter. (Doc. 57, p. 18; Doc. 57-1, at 426–27.) Neither record cite that Thomas provides proves, by a preponderance of the evidence, that Thomas' purported protected activity on July 13, 2020, caused his termination. *See Rookaird*, 908 F.3d at 460.

### 2. July 25, 2020

Thomas next argues that he engaged in protected activity on July 25, 2020, when he and his co-conductor spoke up about the safety issues with the key train. (Doc. 57 at 15-16.) To support this contention, Thomas cites to his own testimony and cites to documents

in "Exhibit F" that either do not exist or are not clearly marked. (*Id*. at 19–21.) Thomas also fails to provide any legal authority to support his argument. (*Id.*) Rather, Thomas generally states, "[s]peaking up and refusing to perform an action that an employee—[i]n good faith—believes is both dangerous and in violation of federal rules and regulations is exactly type of scenario contemplated by the FRSA." (*Id.* at 16.) Thomas again fails to prove, by a preponderance of the evidence, that his "speaking up" on July 25, 2020, caused his termination.

With respect to record cites that either do not exist or are mislabeled, the Court is not obligated "to scour the record in search of a genuine issue of triable fact," or to try and corroborate Thomas' exhibits; rather, it is Thomas who must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan*, 91 F.3d at 1279. This only leaves Thomas' own testimony to support his argument. Without more, however, this Court cannot find that Thomas proved, by a preponderance of the evidence, that speaking up about safety concerns on July 25, 2020, constitutes protected activity that contributed to his termination, or that a "genuine issue" of material fact exists. *See Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir. 1996); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) (refusing to find a "genuine issue" of fact where "the only evidence presented is 'uncorroborated and self-serving' testimony") (internal citation omitted); *Zolnierz v. Arpaio*, No. CV-11-146-PHX-GMS, 2012 WL 1432537, at *2 (D. Ariz. Apr. 25, 2012) (summary judgement may be granted when the non-moving party can produce only "uncorroborated and self-serving" statements that lack an evidentiary basis) (internal citation omitted).

### 3.   July 26, 2020

The day after the train derailment, Thomas argues that he engaged in protected activity when he and twenty-four other employees "submitted a letter to BNSF outlining numerous and egregious violations against BNSF employees by BNSF." (Doc. 57 at 16.) Thomas states that in response to this letter, "it is unclear what corrective actions BNSF took" but then argues "Thomas was cited for discipline and stood for dismissal in response

to speaking up about violations concerning the train make up and inoperable dynamic brakes in connection to the derailment that took place a day prior to the submission of the July 26, 2020, letter." (*Id.* at 21.) Thomas only cites to the July 26, 2020 letter and his July 13, 2020 letter to the FRA to support this argument. (*Id.*) He cites nothing to support his contention that the July 26, 2020 letter caused BNSF to terminate him, or that BNSF terminated anyone else who signed the July 26, 2020 letter. (Doc. 57.) At best, Thomas makes a temporal proximity argument, but when evaluating FRSA retaliation claims, courts have consistently held "that more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 792 (8th Cir. 2014) (internal quotations omitted); *see also Despain v. BNSF Ry. Co.*, No. CV-15-08294-PCT-NVW, 2018 WL 1894708, at *6 (D. Ariz. Feb. 20, 2018) ("Temporal proximity of the adverse employment action is probative, although it is insufficient on its own to establish a prima facie case.") Thomas fails to prove, by a preponderance of evidence, that the letter he signed on July 26, 2020, constitutes protected activity that contributed to his termination.

### 4. Termination in Absence of Protected Activity

Had Thomas proven by a preponderance of the evidence that any one of these incidents, or all three of these incidents, were protected activities that contributed to his termination, BNSF still prevails because it provides clear and convincing evidence that it would have "taken the same unfavorable personnel action in the absence of [the protected activity]." *Frost*, 914 F.3d at 1195.

BNSF cites to many facts in the record that Thomas was ultimately terminated, despite numerous performance issues, because he caused the July 25, 2020 train derailment that resulted in $2.2 million in damages. (Doc. 49-9 at 5 ¶ 10; Doc. 49-8 at 140–46; Doc. 49-1 at 414–17.) For example, BNSF's Technical Research and Development group analyzed the data, ran a reenactment, and determined train handling—specifically, excessive dynamic braking by Thomas—to be the cause of the derailment. (Doc. 49-5 at 33:3-19; Doc. 49-8 at 140–46.)  When BNSF conducted the investigative hearing regarding

the July 25, 2020 derailment, it presented evidence from its Technical Research and Development group which confirmed excessive dynamic braking to be the cause of the derailment, and that Thomas, as the engineer for the July 25, 2020 train, was solely responsible for dynamic braking. (Doc. 49-8 at 108, 112, 151–236; 173–75; Doc. 49-5 at 44:19-24, 47: 5-13, 55:7-19.) Mr. Strot also testified that the train was safe and complied with all regulatory requirements. (Doc. 49-8 at 128–29, 198–200.) BNSF also explains that Thomas' co-crewmember, who was not responsible for braking or the derailment, was not subject discipline. (Doc. 49-10 at 5 ¶ 7.) Thomas' improper handling that led to the train derailment, constituted his fourth Level S violation within a single review period and stood for dismissal. (*Id.* at ¶10) BNSF ultimately decided that Mr. Thomas should be dismissed "for carelessness of the safety of [him]self and others when [he] failed to properly control [his] train consistent with good train handling and limit[ing] excessive in-train forces resulting in damage to track structure and equipment . . . on July 25, 2020." (Doc. 49-10 at 10.) The only evidence to the contrary is Mr. Newman's stricken report, where he explains that a sunkink could have contributed to the derailment, but as explained above, his testimony and opinion fails under *Daubert*. *See supra* Section I.B.2.

Because Thomas has not presented any evidence that BNSF terminated him for his purported protected activities, and BNSF has presented clear and convincing evidence it would have terminated Thomas irrespective of his purported protected activities, BNSF is entitled to summary judgment on Thomas' FRSA retaliation claim.

### III. CONCLUSION

Accordingly,

**IT IS ORDERED** granting Defendant BNSF Railway Company's Motion to Exclude/ Strike Plaintiff's Experts and shall exclude Robert Newman and Robert McCarthy as experts. (Doc. 50.)

**IT IS FURTHER ORDERED** granting Defendant BNSF Railway Company's Motion for Summary Judgment. (Doc. 49.)

**IT IS FURTHER ORDERED** directing the Clerk of Court to enter judgment in

1  favor of BNSF Railway Company and that Clerk of Court close the case.
2      Dated this 10th day of August, 2023.

*Michael T. Liburdi*
Michael T. Liburdi
United States District Judge